<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Civil Action No. 04-4245 |
| Plaintiff, | **<u>OPINION</u>** |
| v. |  |
| SEARS ROEBUCK & COMPANY, |  |
| Defendant. |  |

**APPEARANCES**:

    Jacqueline McNair, Esquire
    Judith O'Boyle, Esquire
    Marisol Ramos, Esquire
    Equal Employment Opportunity Commission
    Philadelphia District Office
    21 South Fifth Street, Suite 400
    Philadelphia, PA 19106-2515
        Attorneys for Plaintiff

    Sidney R. Steinberg, Esquire
    Robert J. Toy, Esquire
    Post & Schell, P.C.
    Four Penn Center
    1600 John F. Kennedy Boulevard
    Philadelphia, PA 19103
        Attorneys for Defendant

**RODRIGUEZ, Senior District Judge:**

This matter comes before the Court on Defendant's Motion for Summary Judgment [18].  For the reasons discussed below, Defendant's motion will be denied.

## I.  FACTUAL BACKGROUND

Edwin Broadard ("Broadard"), an African-American male, began his employment with National Tire Warehouse in January of 1994 as an alignment technician in one of Defendant's Delaware stores.[1]  (Def. Mot. Summ. J., p. 2.)  Between 1998 and 1999, Broadard was promoted to service manager by Erik Kertesz, the district manager. (Def. Mot. Summ. J., p. 2.)  In 1999, Broadard received another promotion by Kertesz to the position of assistant store manager. (Def. Mot. Summ. J., pp. 2-3.)  In 2000, Kertesz promoted Broadard to store manager at Defendant's Maple Shade, New Jersey location. (Def. Mot. Summ. J., p. 3.)  As store manager, Broadard was directly supervised by Kertesz, the district manager, who reported to Gary MacCausland, the regional manager. (Def. Mot. Summ. J., p. 3.)  This district was known as the Philadelphia district and consisted of sixteen stores including Maple Shade.  (Def. Mot. Summ. J., p. 4.)

On February 13, 2003, MacCausland and Kertesz held a meeting for the Philadelphia district store managers to discuss Sears's alignment sales procedure.  (Def.

---

[1] National Tire Warehouse became National Tire and Battery ("NTB") in the mid-1990's, both of which were wholly owned subsidiaries of Sears Roebuck and Co.  NTB was sold by Sears in December, 2003 and is no longer affiliated with NTB in any respect. (Def. Mot. Summ. J., p. 2)

Mot. Summ. J., p. 4.)  Prior to the meeting, Sears had performed free alignment checks. (Def. Mot. Summ. J., p. 4.)  A Sears Customer Service Associate ("CSA") entered the operation code "1300", which prompted the servicing technician to perform a free alignment check, on each work order generated when a customer brought in a vehicle for servicing.  (Def. Mot. Summ. J., p. 4.)  If the technician determined that an alignment was necessary, the CSA would attempt to sell the alignment service to the customer.  (Def. Mot. Summ. J., p. 4.)  However, at the meeting, the store managers were informed that Sears would no longer perform free alignment checks.  (Def. Mot. Summ. J., p. 4.)  The managers were also informed that the "1300" operation code was not to be used.  (Def. Mot. Summ. J., p. 4.)  Rather, the alignment service was to be pre-sold to the customer by the CSA and if it was determined that the alignment was not necessary, then the service would be removed from the customer's invoice.  (Def. Mot. Summ. J., p. 5.)

On February 25, 2003, Kertesz visited the Maple Shade store and observed a technician, improperly perform an alignment on a vehicle.  (Def. Mot. Summ. J., p. 9.) Kertesz reported this to the store's assistant manager in Broadard's absence.  (Def. Mot. Summ. J., p. 9.)  Kertesz returned the next day to verify whether the technician had completed his training for alignments.  (Def. Mot. Summ. J., p. 9.)  While waiting in the service area, Kertesz noticed a work order with a red check mark.  (Def. Mot. Summ. J., p. 9.)  Kertesz questioned Broadard about the red check mark.  Broadard responded that it signaled to the technicians that a free alignment check should be performed.  (Def. Mot.

Summ. J., p. 9.) Kertesz told Broadard, and Broadard agreed, that Sears had discontinued the practice of performing free alignment checks. (Def. Mot. Summ. J., p. 9; Pl. Opp., Exh. 2, pp. 124-25.) Kertesz then took two of the CSAs on duty to lunch and had them each write a statement on the use of the red check mark. (Def. Mot. Summ. J., p. 10.)

In addition, Kertesz determined that the technician had not completed the requisite training to perform alignments.[2] (Def. Mot. Summ. J., p. 10.) After leaving the Maple Shade store, Kertesz contacted MacCausland and then Doreen Stachowski, the regional human resources manager. (Def. Mot. Summ. J., p. 12.) Kertesz then sent Stachowski a package of documents regarding both the technician and the red check mark. (Def. Mot. Summ. J., p. 12.) After Stachowski reviewed the documents, a consensus was reached between Stachowski and Kertesz, with MacCausland in agreement, that Broadard would be terminated. (Def. Mot. Summ. J., p. 12.) Broadard was terminated on March 7, 2003, for insubordination due to the use of the red check mark and for promoting the technician to a Level II technician and allowing him to perform Level II work without the requisite training. (Def. Mot. Summ. J., p. 14.) On November 21, 2003, Broadard filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") alleging that he was terminated because of his race. (Pl. Opp., p. 15.)

---

[2] To advance as a technician, an employee must complete a two-step process involving both in-store and corporate-level training. (Def. Mot. Summ. J., p. 10.) The in-store process consist of reading several books in which the employee is tested by the store manager. (Pl. Opp., p. 7.) It is the store manager's responsibility to record the employee's scores on Sears' intranet system. (Pl. Opp., p. 7.)

## II.  DISCUSSION

**A.  Summary Judgment Standard**

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, a Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the facts might affect the outcome of the suit. Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts

showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'"  Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## B.  Prima Facie Case

Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991 ("Title VII").  Title VII prohibits an

employer from discharging individuals because of their race.  42 U.S.C.A. § 2000e-2(a)(1).  Plaintiff may show a violation of Title VII under either a disparate impact theory or a disparate treatment theory.  EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990).  This case involves a disparate treatment claim, because EEOC alleges that Sears discharged Broadard on account of his race.  A plaintiff may succeed on a disparate treatment claim if it can establish a prima facie case of discrimination.  Id.  Once a prima facie case is shown, the burden of production switches to the employer to demonstrate a legitimate, nondiscriminatory reason for the adverse action.  Id.  The burden of production then shifts back to the plaintiff to rebut the employer's reasons.  Id.

   To demonstrate a prima facie case, a plaintiff must show that: "(1) he belongs to a racial minority; (2) he was qualified for the position; (3) he was discharged; and (4) other employees not in a protected class were treated more favorably."  Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993) (citing Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987)).  The prima facie case "should not be viewed as a rigid formula" and to insure that all persons are protected by Title VII, "federal courts simply cannot make the prima facie case unduly burdensome."  Metal Serv., 892 F.2d at 347, 351; see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981) ("[t]he burden of establishing a prima facie case of disparate treatment is not onerous.").  For the purposes of its motion, Sears only challenges whether EEOC may make a prima facie showing on the fourth element.

To satisfy the fourth element, Plaintiff must show that another similarly situated employee belonging to a non-protected class, engaged in conduct that is of "'comparable seriousness' to [Broadard's] own infraction." Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D.Pa. 1994) (quoting Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973)). To be considered a "similarly situated" employee, the person to which the plaintiff is comparing "must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Defendant contends that Plaintiff cannot meet the fourth element because no other store manager engaged in the same conduct as Broadard. (Def. Mot. Summ. J., p. 17.) Defendant argues that Broadard was the only store manager who disregarded the cessation of the free alignment check in combination with promoting and allowing an employee who did not have the requisite training to perform unauthorized work. (Def. Mot. Summ. J., pp. 17, 18.) Plaintiff contends that Defendant failed to follow its disciplinary and termination processes, and that Broadard was treated less favorably than Douglas Gray, a white store manager. (Pl. Opp., p. 19.)

In a document entitled "Addressing Substandard Performance: Tools for Building a High Performance Culture," Sears provided separate procedures for performance

problems (called Performance Plan for Improvement or "PPI") and a six step procedure for "Ethics Policy Violations" ("EPV").[3] Disciplinary action for EPV violations could involve written warnings or termination. (Pl. Opp., Exh. 14.) The conduct that resulted in Broadard's termination fell under the EPV category. (Pl. Opp., p. 9.) EEOC claims that Sears did not follow a number of its EPV procedures; specifically, it argues that Sears failed to conduct a thorough investigation and failed to allow Broadard an opportunity to respond, that Kertesz had a lack of knowledge concerning Title VII, and that Kertesz failed to document the infraction on the required form. (Pl. Opp., p. 10.)

To show less favorable treatment, EEOC points to the treatment of Douglas Gray, a white store manager who worked in the same district as Broadard. In a three month period, Gray received two EPV final warnings and a PPI. On November 25, 2002, Gray was given an EPV final warning for allowing auto technicians to perform work without the requisite training. (Pl. Opp., Exh. 18.) Kertesz elected to give Gray a final warning because it was serious in nature but one that could be corrected. (Pl. Opp., Exh. 2, pp. 186, 189.) On November 27, 2002, a PPI was issued to Gray regarding performance

---

[3] The EPV process was to: (1) contact the Human Resources Manager to discuss appropriate actions; (2) gather all the facts, conduct a thorough confidential investigation, and document all information; (3) provide the associate the opportunity to present his/her explanation of the events; (4) contact Human Resources for guidance if the associate's presence at work during investigative process will have a negative impact on customers, other associates or the business; (5) be cognizant of all relevant laws in addressing performance; (6) document all findings and decisions on the Documentation of Performance Issues form. (Pl. Opp., Exh. 14.)

issues within the store. (Pl. Opp., Exh. 19.) On January 10, 2003, Gray received a second EPV final warning for falsifying training documents and badgering an associate for not covering up the incident. (Pl. Opp., Exh. 20.) Stachowski stated in her deposition that falsifying records by a store manager was a terminable offense and that she would have terminated him. (Pl. Opp., Exh. 15, p. 132.)

In viewing the facts most favorable to the non-moving party, the Court finds that Plaintiff has demonstrated that Broadard was substantially similar to Gray and that Gray was treated more favorably. Both Broadard and Gray worked as store managers in the same district, under the same supervisor, and were subject to the same policies and procedures. Both Broadard and Gray allowed technicians to perform certain work without the required training, yet Gray was given an EPV final warning because his conduct could be corrected whereas Broadard was given no written warning or an opportunity to correct the problem.

Although Gray did not engage in the exact conduct as Broadard in regard to the use of the red check mark, Gray did engage in conduct that is of "comparable seriousness." Anderson, 868 F. Supp. at 745. Gray falsified training records for technicians and badgered one of his associates for not covering up his falsification of the training records. Stackowski testified that this was a terminable offense and that she would have terminated him. Instead of being terminated, Gray was given a second EPV final warning so that he could correct the problem. Broadard on the other hand, was

10

given no written warning for the use of the red check mark and was given no opportunity to correct the problem.

Under Sears's interpretation, Gray would have to engage in the same exact offense as Broadard in order for EEOC to make its prima facie showing. This Court does not interpret the requirements of the prima facie showing so narrowly. The test is not whether they simply engaged in the same conduct; rather, the test is whether the conduct was "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Anderson, 868 F. Supp. at 745 (quoting Mitchell, 964 F.2d at 583). Because both Gray and Broadard were in the same position and their offenses were of comparable seriousness in that both could have been terminated, Plaintiff has met its prima facie burden.

## C.  Rebuttal Case

Once a plaintiff has made its prima facie case of discrimination, the burden of production shifts to the employer to demonstrate legitimate, non-discriminatory reasons for the termination. Metal Service, 892 F.2d at 347. The burden shifting to the defendant allows the employer to rebut the prima facie case and it "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Josey, 996 F.2d at 638 (quoting Burdine, 450 U.S. at 255-56 (1981)). In this case, Defendant has put forth legitimate, non-discriminatory reasons for Broadard's termination. Defendant states that Broadard was terminated because he continued to do

11

free alignment checks and because he promoted and allowed a technician to do certain work without the requisite training.

Once Defendant has put forth legitimate, non-discriminatory reasons, the burden shifts back to Plaintiff to show by a preponderance of the evidence that those reasons are not the true reasons for the termination but a pretext for discrimination. Id. (citing Burdine, 450 U.S. at 253). Plaintiff may demonstrate pretext by either (1) "discrediting the proffered reasons" through direct or circumstantial evidence; or (2) by showing through direct or circumstantial evidence "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Where there is no evidence that it was more likely than not that the employer was motivated by discrimination, "the proper inquiry is 'whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge could support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence necessarily leads to [the] conclusion that the employer did act for discriminatory reasons.'" Josey, 996 F.2d at 638 (citing Chipollini, 814 F.2d at 900) (other citation omitted).

There are a number of factors a court can look at to determine whether an inference of pretext exist in order to defeat summary judgment. One of those factors is defendant's credibility. Id. When attacking the defendant's legitimate proffered reasons, the plaintiff must show "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence[.]'" Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992).

In this case, EEOC offers two arguments it thinks show that Sears's proffered reasons are pretext for discrimination. First, EEOC argues that Sears has been inconsistent in its reasoning for terminating Broadard. In Sears's position statement to EEOC, dated March 17, 2004, Sears stated that Broadard was terminated for two reasons.[4] In a subsequent letter dated July 30, 2004, Sears gave four reasons for the termination of Broadard.[5] MacCausland, the regional manager, testified in his deposition that Broadard was not terminated because of the training issues but because of the free alignment checks. (Pl. Opp., Exh. 6, pp. 34-35.) Stackowski, the regional human resources manager, testified in her deposition that Broadard was terminated for

---

[4] Defendant stated that Broadard was terminated because "1) he violated company policy when he permitted non-certified technicians to be promoted to certified positions and work on customers' vehicles before they permitted the requisite training; and 2) more importantly, he intentionally circumvented company policy and state regulations that prohibit providing vehicle alignment checks to customers without their specific advance approval. (Pl. Opp., Exh. 22, p. 2)

[5] Defendant stated that Broadard was terminated for multiple reasons. He "1) permitted a non-certified technician to be promoted to a certified position; 2) gave the technician an unearned pay raise; 3) permitted the non-certified technician to work on customers' vehicles before they completed the required training; and 4) most importantly, Complainant intentionally circumvented company policy and state regulations that prohibit providing vehicle alignment checks to customers without their specific advance approval. (Pl. Opp., Exh. 23, p. 1)

insubordination in regards to the new procedure for alignments. (Pl. Opp., Exh. 15, p. 116.)

EEOC's second argument is that Sears in its termination of Broadard, deviated from its disciplinary procedures. EEOC alleges that Sears failed to complete several steps of the EPV procedure, specifically steps 2, 3, 5, and 6. With regards to the EPV procedure, Plaintiff alleges that Kertesz failed to conduct a thorough confidential investigation because he only interviewed two of the four CSAs at the store, that Kertesz did not give Broadard the opportunity to present his explanation of the events, that Kertesz did not know what Title VII prohibited in terms of discrimination (he testified that he thought Title VII meant "affirmative action"), and that Kertesz failed to document Broadard's violations on the Performance Issues form and did not give Broadard any documentation referencing the reasons for his termination.

Based upon the record, when viewed in a light most favorable to the non-moving party, the Court finds that there remain genuine issues of material fact which could lead a reasonable factfinder to conclude that Sears's reasons for termination were pretextual. First, Defendant's correspondence with Plaintiff gives two reasons for Broadard's dismissal: (1) failing to follow the alignment procedure; and (2) promoting the technician allowing him to do work without the requisite training. MacCausland, however, testified in his deposition that Broadard was terminated for performing free alignment checks, not the training issues. Stackowski also testified that Broadard was terminated for

insubordination in regard to changing the new alignment policy.  These inconsistencies present credibility questions for the factfinder.  Because credibility determinations are the province of the fact finder and because a reasonable fact finder could conclude that Sears's proffered reasons were pretextual, summary judgment is inappropriate.

Second, with regard to the EPV procedures, Sears disputes EEOC's assertion that it failed to follow its procedure.  Sears argues, <u>inter alia</u>, that Kertesz's interviewing only two of the four CSA's does not demonstrate that he acted with discriminatroy animus and that his decision was reasonably informed, that Broadard did have an opportunity to respond, and that documentation on the form was not necessary because Broadard was being terminated.  EEOC argues, <u>inter alia</u>, that interviewing only two of the four CSAs is not a thorough investigation, that Kertesz did not give all the pertinent information to Stackowski namely that Kertesz failed to tell her that Broadard had agreed to correct the problem, that Broadard did not have an opportunity to give his version of the events, and that no documentation was given to Broadard about his violations or explaining why he was terminated.  These issues are material disputed facts, and when viewed in a light most favorable to Plaintiff, a reasonable fact finder could conclude that a deviation from an established procedure demonstrates a pretext for discrimination. Therefore, a genuine issue for trial exists.  Accordingly, summary judgment is inappropriate.

### III. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgement [18] will be

denied.

    An appropriate Order will issue this date.


                                          <u>/s/ Joseph H. Rodriguez</u>
                                          JOSEPH H. RODRIGUEZ
                                          United States District Judge

DATED: April 24, 2006